UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| PETER W., <br>     *Plaintiff*, <br><br> v. <br><br> MARTIN O'MALLEY, <br>     *Defendant*. | No. 3:23-cv-00706 (JAM) |

**ORDER REVERSING DECISION OF THE COMMISSIONER OF SOCIAL SECURITY AND REMANDING FOR CALCULATION OF BENEFITS**

Plaintiff Peter W. is a former firefighter who claims that he is disabled and cannot work because of injuries sustained in the line of duty.[1] Pursuant to 42 U.S.C. § 405(g), Plaintiff seeks review of the final decision of the Commissioner of Social Security, who denied his claim for Title II social security disability insurance benefits.[2] He has filed a motion for judgment on the pleadings, moving for the Court to reverse the decision of the Commissioner and to remand for a calculation and payment of disability benefits.[3] The Commissioner concedes error and seeks remand, but urges the Court to remand for further proceedings rather than for a calculation of benefits.[4]

Plaintiff first applied for disability benefits in June 2016 and has appeared in three separate hearings before Social Security Administration (SSA) administrative law judges in

---

[1] To protect the privacy interests of social security litigants while maintaining public access to judicial records, this Court will identify and reference Plaintiff solely by first name and last initial. *See* Standing Order – Social Security Cases, No. CTAO-21-01 (D. Conn. Jan. 8, 2021).

[2] When Plaintiff filed the suit in June 2023 (Doc. #1 at 1), Kilolo Kijakazi was serving as the Acting Commissioner for Social Security. Following Senate confirmation, Commissioner Martin O'Malley was sworn into office on December 20, 2023. *See Commissioner Martin O'Malley*, Soc. Sec. Admin., https://www.ssa.gov/agency/commissioner/ (last visited Sept. 29, 2024) [https://perma.cc/9TEX-M938]. Pursuant to Fed. R. Civ. P. 25(d), the Clerk of Court shall substitute the Commissioner of Social Security Martin O'Malley as the defendant in place of Acting Commissioner Kilolo Kijakazi, who was initially named as the defendant.

[3] Doc. #17.

[4] Doc. #21.

connection with his claim. This is the second time the Commissioner has asked a federal court to remand Plaintiff's case for further proceedings. For the reasons discussed below, I will grant Plaintiff's motion to reverse the decision of the Commissioner and remand for payment and calculation of benefits.

## BACKGROUND

I refer to the transcripts provided by the Commissioner.[5] Plaintiff is a 48-year-old former firefighter who lives with his wife and two children in Avon, Connecticut.[6] He is right-hand dominant.[7] In March 2014, Plaintiff was fighting a fire when furniture from an upper floor fell through the burning ceiling and hit him in the neck and right shoulder.[8] The accident led to ongoing pain, spasms, and range-of-motion problems in his right shoulder and neck, for which he sought treatment with various doctors from 2014 through at least 2018.[9] During this time he was under the care of Jo Anne Hannafin, MD, an orthopedic surgeon; Ajay Kiri, MD, a primary care physician; R.C. Krishna, MD, a neurologist; and Debra Goldman, Ph.D., a psychologist.[10] He also sought the care of chiropractor Henry Hall, DC.[11] In their capacities as his treating care providers, Dr. Kiri, Dr, Krishna, Dr. Goldman, and Dr. Hall offered assessments of Plaintiff's ability to work. Plaintiff also met with Ram Ravi, MD, Ann Marie Finegan, MD, and Eleanor Murphy, Ph.D., who offered their opinions on Plaintiff's impairments in their capacity as consulting providers.

*Physical Impairments*

---

[5] *See* Doc. #10. Page references to the transcript are to the pagination generated on the Court's CM/ECF docket. For ease of reference, a citation to the internal Social Security Administration transcript number is provided in the form (Tr. X).
[6] Doc. #10-8 at 30, 32 (Tr. 1039, 1041).
[7] *Id.* at 31 (Tr. 1040).
[8] *Id.* at 32-33 (Tr. 1041-42); *see also* Doc. #10-2 at 44 (Tr. 43).
[9] *See generally* Doc. #10-7 (medical record).
[10] *See* Doc. 10-7 at 183, 251, 247, 231 (Tr. 798, 866, 862, 846).
[11] *Id.* at 196-204 (Tr. 811-19).

Dr. Hannafin performed arthroscopic surgery on Plaintiff's injured shoulder in June 2014, but pain and spasms continued.[12] Starting in May 2014, Plaintiff was under the care of Dr. Kiri, an internal medicine physician.[13] Dr. Kiri oversaw Plaintiff's course of medications, which included Adderall for Attention Deficient Hyperactive Disorder (ADHD) and oxycodone for moderate to severe shoulder and neck pain relief.[14] Dr. Kiri reports discussing the safe use of opiates at length with Plaintiff multiple times.[15]

By September 2014, Plaintiff was reporting a high level of pain and associated sleep disturbances and returned to Dr. Hannafin.[16] In October, a magnetic resonance imaging scan (MRI) revealed he suffered from herniated disks at the C5-6 and C5-7 level of the spine.[17] Later that month, Plaintiff received a steroid injection in his right shoulder, but relief from that injection lasted only two or three days.[18] Dr. Hannafin administered two additional types of injections over November and January, but relief from those injections was also short-lived.[19] In February 2015, Dr. Hannafin reviewed an MRI of Plaintiff's shoulder, which revealed significant scarring.[20]

She advised Plaintiff that he could accept his shoulder as it was and retire from the fire department, or undergo another surgery, which could result in additional problematic scarring.[21] In July 2015, Plaintiff and Dr. Hannafin had another similar conversation when Plaintiff returned to her complaining of deep pain with arm rotation.[22] Dr. Hannafin explained that she could try to

---

[12] *See* Doc. #10-7 at 14-23 (Tr. 629-38).
[13] *Id.* at 335 (Tr. 950).
[14] *Id.* at 336-37 (Tr. 951-52).
[15] *See e.g., ibid*; *id.* at 333 (Tr. 948); 331 (Tr. 946).
[16] Doc. #10-7 at 77-78 (Tr. 692-93); *id.* at 328 (Tr. 943).
[17] *See id.* at 75-76 (690-91).
[18] *Id.* at 73 (688).
[19] *See id.* at 67-68 (682-83); 64-66 (Tr. 679-81).
[20] *Id.* at 53 (Tr. 668).
[21] *Ibid.*
[22] *Id.* at 52 (Tr. 667).

3

clean out the scarring, but this could prompt production of even more scarring, which could result in a more limited range of motion and further disability of the right arm.[23] Plaintiff decided to retire rather than undergo additional surgery, and Dr. Hannafin noted that this was a reasonable choice.[24]

Following a short period of light duty with the fire department, Plaintiff was medically retired on September 16, 2015.[25] The listed diagnoses in the Fire Department Medical Board's accidental disability findings were "post right shoulder arthroscopy, minimal debridement of glenohumeral joint, subacromial decompression, AC joint resection, and cervical spine herniated disc and disc bulges."[26] After retirement, Plaintiff's physical ailments continued. Plaintiff filed his application for Title II social security disability benefits in June 2016, alleging a disability onset of October 20, 2015, due to cervical spine derangement and nerve damage, right shoulder impingement, and bilateral knee pain.[27]

In July 2016, Dr. Kishna requested an MRI of Plaintiff's left knee and lumbar spine that revealed moderate joint effusion, mild patellar and quadriceps tendinosis, and a mild annular bulge at L5-S1.[28] Plaintiff saw Dr. Krishna again in April 2018. At that time, the doctor confirmed his previous diagnoses of multilevel cervical disc bulge and herniation syndrome, multilevel lumber disc bulge syndrome, bilateral C5-C6 radiculopathy, bilateral L5-S1 lumbar radiculopathy, internal derangement of the right shoulder, and internal derangement of the left knee.[29] The doctor judged Plaintiff's injuries to be "of a permanent nature." He expected that

---

[23] *Ibid.*
[24] *Ibid.*; *see also id.* at 187 (Tr. 802).
[25] *See* Doc. #10-7 at 183-85 (Tr. 798-800).
[26] *Id.* at 183 (Tr. 798).
[27] *See* Doc. #10-5 at 2 (Tr. 402), Doc. #10-6 at 5 (Tr. 467).
[28] Doc. #10-7 at 190, 193 (Tr. 805, 808).
[29] *Id.* at 245-46 (Tr. 860-61).

4

Plaintiff would "have intermittent recurring episodes of pain and discomfort."[30] Dr. Krishna found that Plaintiff would be able to sit and stand for less than four hours in a workday and lift no more than ten pounds.[31] Dr. Krishna assessed that Plaintiff would never be able to reach overhead with his right upper extremity, only occasionally reach overhead with his left upper extremity, and that he would be able to only occasionally reach forward and laterally with both arms.[32] Dr. Krishna concluded that Plaintiff would be required to lie down during the work day, would require frequent breaks, and would need two or more sick days per month.[33]

Plaintiff saw Dr. Kiri monthly for treatment of Plaintiff's ADHD and moderate to severe shoulder and neck pain, which included a monthly prescription of oxycodone for pain management between at least May 2014 and July 2017.[34] Assessing Plaintiff's workplace capabilities in 2018, Dr. Kiri said that Plaintiff "has limited ability to sit and concentrate[e] due to worsening neck pain and right shoulder pain," and that he also had "worsening… lumbar pack pain and knee pain."[35] In evaluating the "surgery and extensive multi-disciplinary pain management and rehabilitation" treatments Plaintiff had undergone in the last four years, Dr. Kiri concluded that Plaintiff's "disability is permanent and expected to worsen over time."[36] He also concluded that Plaintiff would be able to sit or stand for less than two hours per day, could not lift more than five pounds, could never reach in any direction with his right upper extremity, and could only occasionally reach in any direction with his left upper extremity.[37] Like Dr.

---

[30] *Id.* at 246 (Tr. 861).
[31] *Id.* at 240 (Tr. 855).
[32] *Ibid.*
[33] *Id.* at 241 (Tr. 856).
[34] *See* Doc. #10-7 at 254-335 (Tr. 869-950).
[35] *Id.* at 253 (Tr. 868).
[36] *Ibid.*
[37] *Id.* at 249 (Tr. 864).

5

Krishna, he indicated that Plaintiff would need to lie down during the work day, take frequent breaks, and would require two or more sick days per month.[38]

Beginning in 2017, Plaintiff sought the care of a chiropractor, Dr. Henry Hall, DC.[39] Plaintiff noted to Dr. Hall that he experienced neck, back, and shoulder pain that limited his daily activities, including house cleaning; laundry; exercising in the gym; sitting, standing, or walking for more than thirty minutes; light repetitive movements; and reaching or stretching for objects.[40] After clinical examination, the chiropractor diagnosed Plaintiff with cervical subluxation, cervical radiculopathy, neck sprain, mild left paracentral disc herniation at C5/C6, mild left paracentral disc protraction at C6/C7, mild flattening of the central spinal cord to the left of the midline at the C5/C6 level, sciatic pain, lumbar subluxation, lumbar radiculopathy, lumbar sprain, mild to moderate A.C. joint arthrosis with superimposed mild A.C. joint ligament sprain, moderate bone marrow edema on both sides of the A.C. joint and periarticular soft tissue edema, tear of the anterior glenoid labrum, small mild degree partial-thickness articular surface tear of the distal infraspinatus tendon, moderate partial tear/tendinosis of the subscapularis tendon with generalized tendon thickening, and bilateral shoulder impingement.[41]

In assessing Plaintiff's ability to do sedentary work, Dr. Hall noted that Plaintiff would be able to stand or walk for less than one hour per day; be able to sit for less than two hours per day; could not lift more than five pounds; and could never reach overhead, forward, or laterally with his upper extremities.[42]

---

[38] *Id.* at 250 (Tr. 865).
[39] *See* Doc. 10-7 at 198 (Tr. 813).
[40] *See id.* at 198, 204 (Tr. 813, 819).
[41] *Id.* at 201-02 (Tr. 816-17).
[42] *Id.* at 196 (Tr. 811).

6

Since filing his application for disability benefits in June 2016, Plaintiff has seen two consulting internists: Dr. Ravi in August 2016 and Dr. Finegan in February 2020.[43] Dr. Ravi found that Plaintiff "has no limitations sitting or standing. He has moderate limitations bending, pushing, pulling, lifting, carrying, and overheard activities."[44] He commented that Plaintiff should "avoid driving and squatting due to his neck pain, back pain, bilateral knee pain, and bilateral shoulder pain."[45]

After Dr. Finegan examined Plaintiff in February 2020, she stated that Plaintiff "should not perform any above desk work using the right arm. He should not push, pull, life or carry more than 10 [pounds] using the right arm."[46] She further found that Plaintiff is "mildly limited with regard to his ability to perform tasks requiring kneeling, crouching, crawling or balancing," and that "[h]e should not perform task[s] that would necessitate full normal [range of motion] of the cervical spine."[47]

*Mental Impairments*

In 2017 and through at least 2021, Plaintiff sought the care of Dr. Goldman, a psychologist.[48] Writing in 2018, Dr. Goldman reported that Plaintiff struggled with feelings of uselessness and "without the job that defined who he was."[49] While he was "compliant with psychological treatment protocols," Plaintiff developed "behaviors that [were] inconsistent with his pre-accident personality," including "moodiness, angry outburst, tearfulness, hyper vigilance,

---

[43] *See* Doc. #10-8 at 11 (Tr. 1020).
[44] Doc. #10-7 at 171 (Tr. 786).
[45] *Ibid.*
[46] *Id.* at 356 (Tr. 971).
[47] *Ibid.*
[48] Doc. #10-7 at 390 (Tr. 1005).
[49] *Id.* at 231 (Tr. 846).

7

worrisome thinking, and 'focusing' difficulties."[50] She believed these difficulties were "a direct consequence of the sudden loss of his employment due to the work-related accident."[51]

Dr. Goldman reported that Plaintiff would have moderate difficulties understanding and remembering past instructions, carrying out complex instructions, and making judgments in complex work-related decisions.[52] She reported that he "becomes overwhelmed easily" and that those feelings caused him to be less focused and cogitatively effective. Dr. Goldman assessed that Plaintiff would have no difficulties with simple work-related tasks and instructions, but that his impairments would cause mild difficulty interacting with the public.[53] In terms of working with others, she said that Plaintiff's tendency to over-react to perceived conflict would lead to moderate difficulty interacting with supervisors and co-workers and responding appropriately to workplace situations.[54]

In 2020, Plaintiff consulted with Eleanor Murphy, Ph.D. to evaluate his mental health impairments in connection with his application for social security disability benefits.[55] Dr. Murphy diagnosed him with adjustment disorder with depressed mood and post-traumatic stress disorder.[56] His depressive symptomatology included "sad moods, psychomotor retardation, crying spells, irritability, psychomotor agitation, fatigue, worthlessness, diminished self-esteem, concentration difficulties, diminished sense of pleasure, and social withdrawal."[57] Dr. Murphy assessed that Plaintiff had no limitations when it came to simple work tasks but mild limitations to understand, remember, and apply complex directions and instructions.[58] She assessed that he

---

[50] *Ibid.*
[51] *Ibid.*
[52] *Id.* at 236 (Tr. 851).
[53] *Ibid.*
[54] *Id.* at 237 (Tr. 852).
[55] Doc. #10-7 at 343 (Tr. 958).
[56] *Ibid.*
[57] *Id.* at 343-44 (Tr. 958-59).
[58] *Id.* at 346 (Tr. 961).

has mild limitations regarding interactions with coworkers and the public and moderate limitations regulating his emotions and behavior.[59] She judged that Plaintiff's psychiatric difficulties did not "appear to be significant enough to interfere with the claimant's ability to function on a daily basis."[60]

### *Procedural History*

Plaintiff applied for disability insurance benefits on June 7, 2016, asserting a disability onset date of October 20, 2015.[61] On October 13, 2016, SSA denied his claims at the initial level of review, and he then requested a hearing before an administrative law judge (ALJ).[62] On June 7, 2018, Plaintiff testified before the ALJ.[63] By Notice of Decision dated October 9, 2018, the ALJ denied Plaintiff's claims based on a finding that he retained the ability to perform past work as a gate guard.[64]

Plaintiff appealed and, on November 21, 2019, the Appeals Council vacated the ALJ's decision and remanded the case for further findings regarding Plaintiff's mental impairments and for assessment of Plaintiff's residual function capacity giving proper consideration to the treating source opinions.[65] On remand, Plaintiff again testified in a hearing before the ALJ.[66] On July 15, 2021, the ALJ again denied Plaintiff's claim, this time based on a determination that Plaintiff had the capacity to work as an addressing clerk or document preparer.[67] Plaintiff requested the

---

[59] *Ibid.*
[60] *Ibid.*
[61] Doc. #10-5 at 2 (Tr. 402).
[62] *See* Doc. #10-4 at 4, 16 (Tr. 138, 150).
[63] *See* Doc. #10-2 at 39-78 (Tr. 38-77).
[64] *See* Doc. #10-3 at 12-25 (Tr. 112-125).
[65] *See id.* at 33 (Tr. 133) (citing 20 CFR § 404.1527).
[66] *See* Doc. #10-2 at 79-102 (Tr. 78-101).
[67] *Id.* at 2, 23 (Tr. 1, 22).

Appeals Council review the second ALJ decision.[68] This time, the Appeals Council denied review, and Plaintiff commenced a civil action in federal court.[69]

At the district court, the Commissioner moved for remand under sentence four of 42 U.S.C. § 405(g). She found that it would be necessary for an ALJ on remand to further consider Plaintiff's residual function capacity (RFC), properly weigh the medical evidence, provide a narrative link to support findings resolving the issues with RFC and weight of medical evidence, offer the claimant an opportunity for a hearing, issue a new decision, and obtain current testimony from a vocational expert (VE) on the types of jobs available in the national economy for Plaintiff.[70] The district court then entered judgment in favor of Plaintiff and, per the Commissioner's request, remanded to the agency for further proceedings.[71]

Plaintiff and his counsel then appeared for a third time before an ALJ, this time before a different ALJ in a telephonic hearing on January 10, 2023.[72] Vocational expert Tanya Edghill also testified by phone.[73] On February 2, 2023, the ALJ issued a decision concluding that Plaintiff was not disabled within the meaning of the Social Security Act.[74] Plaintiff filed this action in federal court on June 1, 2023.[75]

## DISCUSSION

The Court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); *see also* 42 U.S.C.

---

[68] *See id.* at 133-153 (Tr. 597-617).
[69] Doc. #10-9 at 39 (Tr. 1098).
[70] *Id.* at 36-37 (Tr. 1095-96).
[71] *Id.* at 39 (Tr. 1098).
[72] Doc. #10-8 at 24 (Tr. 1033).
[73] *Id.* at 26 (Tr. 1035).
[74] *See id.* at 2 (Tr. 1011).
[75] Doc. #1.

§ 405(g).[76] Substantial evidence is "more than a mere scintilla" and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (*per curiam*). Absent a legal error, the Court must uphold the Commissioner's decision if it is supported by substantial evidence, even if the Court might have ruled differently had it considered the matter in the first instance. *See Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

Here, the Commissioner has conceded legal error.[77] The Commissioner states that "remand is necessary because the ALJ did not apply the correct legal standard."[78] In particular, "[t]he ALJ . . . did not properly consider several medical opinions pursuant to 20 C.F.R. § 404.1527."[79] And the ALJ did not resolve a conflict between the VE's testimony and the Dictionary of Occupational Titles, as the ALJ was required to do by both the Second Circuit and SSA regulations. The Commissioner believes that the proper remedy is a remand for further administrative proceedings, arguing that the "record does not compel the conclusion" that Plaintiff is disabled.[80] By contrast, Plaintiff argues that remand solely for the calculation of benefits is the appropriate remedy.[81]

Therefore, the only issue before this Court is whether to remand for further proceedings or solely for the calculation of benefits. For the following reasons, I am persuaded that remand for calculation of benefits is the proper course of action.

### *The ALJ's 2023 Decision*

---

[76] Unless otherwise noted and for ease of reading, this ruling omits all internal quotations, brackets, and derivative citations for all quotations from cases.
[77] Doc. #21-1 at 1.
[78] *Ibid.*
[79] *Ibid.*
[80] *Ibid.*
[81] Doc. #18 at 40.

To qualify as disabled, a claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months," and "the impairment must be 'of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.'" *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 45 (2d Cir. 2015) (quoting 42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A)). "[W]ork exists in the national economy when it exists in significant numbers either in the region where [claimant] live[s] or in several other regions of the country," and "when there is a significant number of jobs (in one or more occupations) having requirements which [claimant] [is] able to meet with his physical or mental abilities and vocational qualifications." 20 C.F.R. § 404.1566(a)-(b); *see also Kennedy v. Astrue*, 343 F. App'x 719, 722 (2d Cir. 2009).

The agency engages in the following five-step sequential evaluation process to determine whether a claimant is disabled:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019); 20 C.F.R. § 404.1520(a)(4).

In applying this framework, if an ALJ finds a claimant to be disabled or not disabled at a particular step, the ALJ may make a decision without proceeding to the next step. *See* 20 C.F.R.

§ 404.1520(a)(4). The claimant bears the burden of proving the case at steps one through four; the burden shifts at step five to the Commissioner to demonstrate that there is other work that the claimant can perform. *See McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).

After proceeding through all five steps, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act. Both parties agree that the issues in this case arose at steps four and five.[82]

### *Step Four*

In determining the ALJ's residual function capacity at step four, the ALJ determined that Plaintiff has the ability "to perform light work as defined in 20 C.F.R. § 4041567(b), and . . . generally retained the ability to sit, stand or walk."[83] He also concluded that Plaintiff was restricted to jobs that required him to lift or carry no more than 10 pounds; was required to change positions for five minutes after two hours; and could do "no more than occasional kneeling, crouching, crawling, decision-making or interaction with the public."[84] Furthermore, Plaintiff would need a job that "did not require employees to reach above the level of the height of a desk with their arms."[85]

In determining Plaintiff's RFC, the ALJ did not abide by the treating physician rule. This rule requires that "the opinion of a [plaintiff's] treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128 (quoting 20 C.F.R. § 404.1527(c)(2)). The Commissioner noted that "[a]dherence to the treating physician rule is

---

[82] *See* Doc. #18 at 6; *see also* Doc. # 21-1 at 1.
[83] Doc. #10-8 at 9 (Tr. 1018).
[84] *Ibid.*
[85] *Ibid.*

critical as it provides several procedural and substantive advantages to ensure an ALJ grants deference to the views of the physician who has engaged in the primary treatment of the claimant." Doc. #21-1 at 28 (citing *Rolon v. Comm'r of Soc. Sec.*, 994 F. Supp. 2d 496, 506 (S.D.N.Y. 2014)).

When the treating physician's opinion is not given controlling weight, "the ALJ must explicitly consider" a number of factors to determine the proper weight to assign, including "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and, (4) whether the physician is a specialist." *Estrella*, 925 F.3d at 95-96 (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (*per curiam*)); *see generally* 20 C.F.R. § 404.1527(c). The ALJ then must "give good reasons in [his] notice of determination or decision for the weight [given the] treating source's [medical] opinion." *Estrella,* 925 F.3d at 96 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (*per curiam*)).

The Commissioner acknowledges that the ALJ did not follow this rule at least as it pertains to treating providers Hall and Krishna and consulting provider Ravi. The ALJ concluded that the opinions of treating physicians Hall and Krishna were entitled to "little weight," but that opinion of consulting physician Ravi should be assigned "significant weight."[86] In coming to his conclusions about Dr. Ravi—who assessed that Plaintiff could sit or stand without limitation and that he had only moderate limitations in his upper extremities—the ALJ acknowledged that "the reasons for Dr. Ravi's conclusions are not entirely clear," but the ALJ nonetheless found them to be "consistent with the overall record."[87] In minimizing Dr. Hall's analysis that Plaintiff could lift or carry no more than five pounds, could not stand for more than an hour, and could not sit

---

[86] Doc. #10-8 at 12 (Tr. 1021).
[87] *Ibid.*

for more than two hours, the ALJ provided the bare-bones explanation that the "opinion has been contradicted by the treatment records" without pointing to any specific contradictions.[88]

The analysis regarding Dr. Krishna is more perplexing. The ALJ found that Dr. Krishna's diagnoses of "a torn rotator cuff in the claimant's right shoulder, two herniated discs in the cervical spine and bilateral radiculopathy at the C5-6 level" provided "no indication of any physical condition in the lower body that would impact the claimant's ability to sit through the workday."[89] Based on an unsupported analysis that only lower body conditions could impact Plaintiff's ability to sit for long periods of time, the ALJ assigned Dr. Krishna's opinion "little weight."[90]

The ALJ's analysis also fell short of following the treating physician rule as to assessing the conclusions of Dr. Kiri. The ALJ concluded that the opinion of Dr. Kiri, who treated Plaintiff for over three years, was entitled to "no weight." The conclusion was based on a statement from Dr. Kiri that Plaintiff was "100% disabled." The ALJ dismissed the treating physician's evidence and analysis because determinations regarding level of disability "are reserved to the Commissioner of Social Security under [SSA's] regulations."[91] But assuming that Dr. Kiri was not permitted to come to a legal conclusion regarding Plaintiff's level of disability, the dismissal of Dr. Kiri's entire assessment was not consistent with the ALJ's own obligations under the treating physician rule to consider Dr. Kiri's medical opinions and treating relationship with Plaintiff. *See* 20 C.F.R. § 404.1527. In rejecting Dr. Kiri's analysis, the ALJ repeated his unsupported conclusion that the damage to Plaintiff's neck and shoulder would not impact

---

[88] *Ibid.*
[89] *Ibid.*
[90] *Ibid.*
[91] *Ibid.*; *see* Doc. #21-1 at 9.

Plaintiff's ability to sit—the same conclusion that led the Commissioner to concede fault with the ALJ's analysis of Dr. Krishna's assessment.[92]

In sum, the ALJ failed to give controlling weight to the three treating physicians who offered conclusions regarding Plaintiff's physical ailments for the purpose of his application for disability benefits. And the ALJ's explanations for why he assigned "great weight" to the consulting physician ring hollow.

### *Step Five*

At step five, the Commissioner bears the burden of "show[ing] that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009). A 2000 Social Security Administration Policy Interpretation Ruling governs the Commissioner's assessment of whether any particular job can accommodate a given claimant's physical limitations. Under the Ruling, the Commissioner "rel[ies] primarily on the [Dictionary of Occupational Titles] ... for information about the [job's] requirements" but "may also use [vocational experts] ... to resolve complex vocational issues." SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000). If the Commissioner does consider the testimony of such experts, however, he must be alert to the possibility of "apparent unresolved conflict[s]" between the testimony and the Dictionary. *Ibid.* In light of this possibility, the Ruling tasks the Commissioner with "an affirmative responsibility to ask about any possible conflict," *id.* at *4, and to "elicit a reasonable explanation for [any such] conflict before relying on the [vocational expert's testimony]." *Id.* at *2.

The Second Circuit has set out in detail what the ALJ must do to comply with the Ruling. *See Lockwood v. Comm'r of Soc. Sec. Admin.*, 914 F.3d 87 (2d Cir. 2019). Where an expert's

---

[92] Doc. #10-8 at 12 (Tr. 1021).

16

testimony seems to conflict with the Dictionary, even if this conflict is not obvious, the ALJ must engage in "a meaningful investigatory effort to uncover apparent conflicts, beyond merely asking the vocational expert if there is one" and then "reconcile" the conflicts so identified. *Id.* at 94. Plaintiff argues *and* the Commissioner concedes that the ALJ did not follow his obligation to resolve conflicts between the VE's testimony and the Dictionary.[93]

Here, the ALJ relied on the VE's testimony to conclude that Plaintiff could perform the jobs of assembler, table worker, and eyeglass polisher.[94] But, as the Commissioner points out, "according to the DOT, all three of the jobs identified by the VE require frequent reaching."[95] The Dictionary does not specify whether those jobs require frequent reaching overhead—which the ALJ found Plaintiff incapable of doing—but the Dictionary's companion publication, the Selected Characteristics of Occupations, defines reaching as extending the hands and arms in *any* direction, including overhead. *See* SCO, Appendix C; *see also* SSR 85-15, 1985 WL 56857, at *7. Yet no attempt was made in either the hearing or the ruling to resolve this conflict.[96]

Here, as in *Lockwood*, the ALJ failed to reconcile the conflict between Plaintiff's inability to reach overhead, that the three jobs identified by the VE require frequent reaching, and that the SSA defines "reaching" to include overhead reaching. *See* 914 F.3d at 92; Doc. #10-8 at 47-49 (Tr. 1056-58); *see also* SSR 85-15, 1985 WL 56857, at *7. The Second Circuit in *Lockwood* held that denials of disability benefits based on such flawed reasoning do not meet the "substantial evidence" standard for upholding an ALJ's decision. *See* 914 F.3d at 91.

***Nature of Remand***

---

[93] Doc. #21-1 at 3; Doc. #18 at 35-36.
[94] Doc. #10-8 at 14 (Tr. 1023).
[95] Doc. #21-1 at 4 (Citing DOT §§ 1991 WL 679271, 1991 WL 680217, 1991 WL 679267).
[96] Doc. #10-8 at 14-15, 46-49 (Tr. 1023-24, 1055-58).

When there are gaps in the administrative record or the ALJ has applied an improper legal standard, ordinarily the matter should be remanded to the Commissioner "for further development of the evidence." *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980). But when a court has "no apparent basis to conclude that a more complete record might support the Commissioner's decision," a remand for a calculation of benefits is appropriate. *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999); *see also Sczepanski v. Saul*, 946 F.3d 152, 161 (2d Cir. 2020) (same). In sum, when there is "persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose," remand for calculation of benefits is the proper course. *See Parker*, 626 F.2d at 235.

This case amply meets the standard for remand solely for calculation of benefits. The vocational expert explained that if Plaintiff was limited to "only occasional" desk-level reaching, that "would eliminate all jobs" that exist in substantial number in the national economy from Plaintiff's possible employment.[97] Given the opinions of all the physicians who treated Plaintiff's physical ailments—Dr. Kiri, Dr. Krishna, and Dr. Hall—the controlling weight their assessments required at step four mandates a conclusion that Plaintiff is limited to *at most* only occasional overhead, forward, and lateral reaching.[98] Even rejecting Dr. Hall's analysis that Plaintiff would never be able to reach forward, overhead, or laterally with either upper extremity, the most optimistic view of Plaintiff's treating physicians is that he would be able to only occasionally reach with his upper extremities. Meanwhile, neither consulting physician directly commented on Plaintiff's ability to reach forward or laterally.[99] According to the SSA's own

---

[97] *Id.* at 48 (Tr. 1057).
[98] Doc. #10-7 at 249, 240, 196 (Tr. 864, 855, 811).
[99] *See* Doc. #10-7 at 171, 356 (Tr. 786, 971). Dr. Ravi found that Plaintiff had "moderate" limitations regarding overheard activities, and Dr. Finegan found that Plaintiff could not engage in any overheard activities with his right arm and did not comment on Plaintiff's ability to use his left arm.

vocational expert, no jobs exist in substantial number in the national economy that would accommodate someone who had the limitations identified by the ALJ *combined* with the ability to only occasionally reach.[100]

If, on remand, Plaintiff's case were evaluated under the proper standards—as the Commissioner is requesting—there would not be substantial evidence in the record that Plaintiff can reach with his arms anything more than occasionally. Remanding to the ALJ for further development only so that the ALJ could reach what amounts to an inevitable conclusion of disability would do nothing more than prolong this already over-lengthy proceeding without purpose. *See Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998) (even though the court does not reweigh evidence, "where application of the correct legal standard could lead to only one conclusion, we need not remand" for further disability determination proceedings).

Plaintiff's claim has been pending for over eight years, and this is the Commissioner's second time requesting remand for repeated legal errors, and this would represent the third time Plaintiff has appeared before an ALJ in this matter. To be sure, "delay alone is an insufficient basis on which to remand for benefits." *Bush v. Shalala*, 94 F.3d 40, 46 (2d Cir. 1996). But the Commissioner "is not entitled to adjudicate a case *ad infinitum* until it correctly applies the proper legal standard and gathers evidence to support its conclusion." *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 746 (10th Cir. 1993). "Remands in cases such as this one are worse than purposeless. They are expensive. Plaintiff ... has already demonstrated entitlement to benefits. Quite apart from the administrative expenses that another remand would entail, each day of delay exacts a cost from a demonstr[ably] deserving claimant." *Maher v. Bowen*, 648 F. Supp. 1199, 1203 (S.D.N.Y. 1986).

---

[100] Doc. #10-8 at 47-48 (Tr. 1056-57).

I am not persuaded that there is any purpose to afford the Commissioner a third opportunity to apply the correct legal standard and carry his burden. *See, e.g., Torres v. Colvin*, 2017 WL 1734020, at *3-4 (D. Conn. 2017) (remanding for calculation of benefits where the Commissioner failed to carry burden at step five, where remand would require a third hearing before an ALJ, and where the claim had been pending for seven years). Accordingly, I will remand for a calculation and payment of benefits.

## CONCLUSION

Plaintiff's motion for judgment on the pleadings is GRANTED, and the Commissioner's motion for an entry of judgment under sentence four of 42 U.S.C. § 405 (g) is DENIED. The Court REMANDS solely for calculation and payment of benefits.

It is so order.

Dated at New Haven this 30th day of September 2024.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge